## IN THE MATTER OF THE APPLICATION OF LEE CHEE HING FOR AND ON BEHALF OF JUNG HUNG, for a writ of *habeas corpus.*

### DECIDED: AUGUST 1, 1903.

1. In an application for a writ of *habeas corpus* made and signed by a Chinese person on behalf of a Chinese woman, where the allegations of the petition show that the woman is forcibly detained in a house belonging to the respondent, and restrained therein through fear of him, and compelled by him to lead a life of prostitution; *Held,* that the allegations of the petition are sufficient to give the court jurisdiction under Subdivision 3 of Section 753 of the Revised Statutes of the United States, "or in custody in violation of the Constitution," in that such allegations show that she is held in involuntary servitude contrary to the Thirteenth Article of the Amendments to the Constitution of the United States.

2. Where the petition in an application for a writ of *habeas corpus* was not signed by the party "for whose relief it was intended," but by a third person in her behalf, *Held,* that while it is true United States Courts are controlled by the provisions of the Habeas Corpus Act which confers the power to issue the writ upon such courts, yet this court will not give such a narrow construction to the Act as would prevent any person like the woman claimed to be restrained of her liberty in this case, from enjoying the benefits of the Act, who is by the very circumstances of her restraint deprived of the opportunity of signing the application in her own behalf.

3.  Section 760 of the Revised Statutes of the United States contemplates the possibility that some third party might make the application for the writ on behalf of the person restrained or deprived of his or her liberty; and said Section must be considered in connection with Section 754.

4.  Every person under the Constitution and laws of the United States is entitled to the enjoyment of personal liberty; of the right of free locomotion to go when and where one pleases, and to do all that is necessary in the conduct of one's affairs, restrained only so far as one infringes upon the rights or the welfare of others.

5.  No form of slavery or involuntary servitude, except as a punishment for crime, can, under Article Thirteen of the Amendments to the Constitution of the United States, be lawfully permitted to exist in this territory.

6.  A Chinese woman shown to have been purchased of her mother in China for $200, and afterwards brought to Hawaii and compelled by the respondent to lead the life of a prostitute, turning all the earnings of such vocation over to him, and who was (while not physically restrained by respondent, in such fear of him by reason of threats against her life should she go out freely) unable to leave the house where he detained her, found by the court to be restrained of her liberty and held in a condition of slavery repugnant to the Thirteenth Article of the Amendments to the Constitution of the United States, and released on *habeas corpus*.

7.  Even if a marriage had existed between the respondent and the woman held under restraint by him, which does not appear to be proven from the facts as shown in this case, still such marriage would give respondent no right to deprive the woman of her personal liberty, and if so deprived, she could have recourse to the writ of *habeas corpus* for release.

8.  It is settled law that a husband cannot detain his wife against her will.

9.  Liberty may be restrained by threats as well as by forcible action, if the power exists to enforce the threats.

## HABEAS CORPUS.

*E. A. Douthitt,* for petitioner.
*C. W. Ashford,* for respondent.

ESTEE, J.   This is an application for a writ of *habeas corpus* filed herein on the 22nd day of July, 1903, by one Lai Chee Hing on behalf of a Chinese woman, one Jung Hung. The petition alleges that the woman is illegally confined and restrained of her liberty by one Jue Gun, who is not the husband of the

said Chinese woman or in any way related to her, but that the said Jue Gun forcibly detains the said Jung Hung in a house on Liliha street, in the city of Honolulu, Island of Oahu, Territory of Hawaii, without any claim or authority whatsoever; that the said woman is so kept in said house by the said Jue Gun for the purposes of prostitution and is compelled to live an infamous and immoral life and is restrained in said house through fear of the said Jue Gun.

That the petitioner is engaged to the said Jung Hung and desires her release so that he may marry her and proceed with her to China; that he does not remove the woman from said house for the reason that he might suffer bodily harm if he should attempt to do so. The writ was issued directed to the said Jue Gun, and made returnable on the 23rd day of July, 1903, at 10 o'clock a. m. before the Court. In response to the prayer of the petition it was further ordered by the Court that the United States Marshal take the said Jung Hung from the custody of the said Jue Gun and convey her to a proper place for safe keeping, pending the return of the writ. The woman was taken by the marshal and placed in the custody of Warden Henry of the Oahu prison.

A return duly filed by the respondent, Jue Gun, denies the unlawful detention or restraint of the woman; alleges a marriage with the woman in the empire of China on the 9th day of July, 1893, according to Chinese custom, and that she has ever since been his lawful wife; that he brought her soon after said marriage to Hawaii and has continuously resided and cohabited with her as his wife ever since, there being three children as the result of said union, a daughter nine years old now in China, a son three years old and a daughter two years old. The respondent denies that he has compelled Jung Hung to live a life of prostitution, denies that she has at any time practiced prostitution with his knowledge or consent, asserts a belief in the virtue of his alleged wife, and says that while petitioner for the writ has been a frequent visitor at his house for several years past, he knew of the marital relations existing between respondent and Jung Hung; finally prays for the dismissal of the petition and denial of the writ.

I will first dispose of the question of jurisdiction raised for the first time after the hearing in respondent's brief.

Chapter Thirteen, P. 142, 144 of the Revised Statutes of the United States (2nd Ed., 1878), treats of the subject of *habeas corpus* and the authority and procedure of the United States Courts in the matter of the issuance of such writs.

By Section 753 authority is granted to the Federal Courts to issue such writs as follows:

"The writ of *habeas corpus* shall in no case extend to a prisoner in jail, unless he is in custody under or by color of the authority of the United States, or is committed for trial before some court thereof; or is in custody for an act done or omitted in pursuance of a law of the United States, or of an order, process, or decree of a court or judge thereof; or is in custody in violation of the constitution or of a law or treaty of the United States; or, being a subject or citizen of a foreign state, domiciled therein, is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection or exemption claimed under the commission, or order or sanction of any foreign state or under color thereof, the validity and effect whereof depend upon the law of nations; or unless it is necessary to bring the prisoner into court to testify."

It is claimed by respondent that this court has no jurisdiction in this case under the foregoing section, and further that it is also without jurisdiction under the provisions of Section 754 of the Revised Statutes which requires that —

"Applications for writs of *habeas corbus* shall be made......
by complaint in writing, signed by the person for whose relief it is intended, setting forth the facts concerning the detention of the party restrained..........The facts set forth in the complaint shall be verified by the oath of the person making the application."

The point made being that the petition in this case, while verified by the party making the application was signed by a third party and not signed by "the person for whose relief it was intended."

There is some weight possibly in the latter contention. But I find upon an examination of the authorities a number of decisions under the original judiciary act of September 24, 1789, where the applications were made by third parties and jurisdiction sustained. It is true that the statute at that time contained no such provision as is now embodied in the Revised Statutes, and which provision was prescribed by the amendment of February 5th, 1867. There are, however, cases under the present statute, in which, while not deciding the point squarely, the Federal Courts have entertained the applications of third parties. *In re Hoyle*, Fed. Case No. 6803 (1879); 9 Am. Law, Rec. 65; *Thomas v. Winne*, 122 Fed. 395 C. C. A.; *Ex parte Reaves*, 121 Fed. 848; *Mahon v. Justice*, 127 U. S. 700.

While it is true the United States Courts are controlled by the provisions of the Act which confers the power to issue the writ upon them, yet I would hesitate to give such a narrow construction to the Act as would prevent any person, like the woman claimed to be restrained of her liberty in this case, from enjoying the benefits of the Act, who is by the very circumstances of her restraint deprived of the opportunity of signing the application in her own behalf.

Upon an examination of the Statute (Chapter 13, R. S. U. S.), Section 760 thereof must be considered in connection with Section 754, and throws some little light on the subject. It seems plain that the possibility was evidently there contemplated that some third party might make the application on behalf of the party restrained or deprived of his or her liberty. Note the language of the Section—"the petitioner or the party imprisoned or restrained, may deny any of the facts that may be material in the case."

I think I may safely hold that this point is not well taken, and that a sensible construction of these sections of the statute, will more effectually carry out the legislative intention and "avoid an injust or an absurd conclusion." *Lau Ow Bew v. U. S.*, 44 U. S. 47, 59; *Holy Trinity Church v. U. S.*, 143 U. S. 457, 461.

I am of opinion that the allegations of the petition would be sufficient to give this court jurisdiction under the third subdivision of Section 753 "or in custody in violation of the constitution. . . . . . . . . . ."

It is prescribed by the thirteenth article of the amendments to the Constitution of the United States that—

"Neither slavery nor involuntary servitude except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States or any place subject to their jurisdiction."

The allegations of the petition are to the effect that this Chinese woman was forcibly detained and confined in the house of respondent in the City of Honolulu and restrained therein through fear of the respondent and by him compelled to lead an immoral and shameful life, a life of prostitution of her body.

The Supreme Court of the United States in the case of *U. S. v. Wong Kim Ark*, 169 U. S. 649, (quoting from page 677), said:

"Undoubtedly while negro slavery alone was in the mind of the Congress which proposed the thirteenth article, it forbid any other kind of slavery now or hereafter."

See also the case of *In re Sah Quah* reported in 31 Fed. 327, where the U. S. District Court of Alaska held that a custom or rite prevailing among the uncivilized tribes of Indians in Alaska whereby slaves are bought and sold and held in servitude against their free will, was contrary to the thirteenth amendment to the Constitution of the United States and the "Civil Rights Bill" of 1866, and a person so held in slavery was released by the order of the court on *habeas corpus*.

Finally in conclusion on this question of jurisdiction, I cannot hold with counsel for respondent that if this court decides that it has jurisdiction in this case, it will "intrench upon the jurisdiction and authority of the territorial courts."

While I do not question the fact that the territorial courts would have had jurisdiction to hear the application for the writ in this case, if their jurisdiction had been invoked in the first instance, yet the petitioner having failed to make his application

in the courts of the territory and those courts not having refused to issue the writ there is no reason why this court having first been applied to for relief, should not under all the facts of the case dispose of the matter. *Buck v. Colbath*, 3 Wall. (U. S.) 334; *In re Chetwood*, 165 U. S. 443.

This case is somewhat unusual, both because of the charges alleged and of the conflict of the testimony as to the facts in relation to the character of the restraint imposed upon the woman, Jung Hung.

It seems to be an admitted fact that under Chinese customs and laws, a traffic is permitted in women and young girls by means of which young girls especially are bought of their parents for stipulated sums, the girls so sold to be used for unlawful and immoral purposes. I am inclined to believe that this proceeding is the result of a transaction of that character.

The respondent alleges as a defense to the proceeding that he was married to the woman Jung Hung in the Empire of China in 1893; that he returned to China from the Hawaiian Islands and he and the said woman were married according to Chinese customs and had ever since cohabited as husband and wife. Respondent introduced in evidence certain small slips of red paper with Chinese characters inscribed thereon, one of which appeared to be when translated into English, the horoscope so-called of a girl, giving her age, name, day and date of birth, etc.; the other an alleged marriage certificate between the parties wherein it appears that "the sum of $200 has per agreement been paid over to the mother of Lew Shee, who duly acknowledged the receipt of the same." Lew Shee is claimed to be the name of the woman Jung Hung.

These papers were quite new and crisp looking for certificates that were alleged to have been written ten years ago, and were entirely unlike certain exhibits introduced by the petitioner as forms of marriage certificates or articles used by people in the same class as respondent and being possessed of the means he testified to having at that time, some seven or eight thousand dollars. He admitted that he gave to the mother of the girl whom he claimed to have married some $200; and testified that

while it was not usual to give money for a wife, yet that Chinese returning to China from foreign countries often did it and that was why he did it.

The woman disclaims utterly any marriage between them; she testified that respondent came to China from Hawaii some eight years ago, and bought her from her mother as his concubine; that he paid her mother $250 for her; that there were no marriage articles, no marriage ceremony; that she was bought by him to do business as a prostitute and that when he paid the money to her mother, they went down immediately aboard the steamer. That this was done in Hongkong; while Jue Gun says the marriage took place in Canton. The woman further testified that when they reached Hawaii he made her say she was his wife and as soon as she arrived here, compelled her to be a prostitute and that she has been a prostitute ever since, giving him the result of her earnings as such prostitute.

Li Ching, a witness on behalf of petitioner and a well known Chinese citizen, the official interpreter of the courts of the territory, upon being examined in relation to the so-called marriage certificate introduced by respondent, testified that he had never seen such a marriage certificate before; that it was not the custom among the Chinese to use that sort of a certificate. He further testified that he never heard of a man giving a sum of money as a present on the occasion of the marriage to the parents; that the gifts usually consisted of cakes; but that if a man desires to take a woman as a concubine, sometimes then a sum of money is stipulated for between the parties. He further testified that a man can with the consent of the parents buy a woman for bondage by putting up so much money.

While there is a discrepancy in the amounts testified to as passing between the parties, yet it is admitted by all parties that a sum of money was paid by the respondent to the mother of the woman, when she passed into his possession. The respondent, Jue Gun, when asked by the court "how much money did you give for this woman?" answered "$200."

I do not think a marriage has been proven; but rather in

the opinion of the court a purchase and sale of this woman as a concubine, for purposes of prostitution.

But even if a marriage had been proven to exist between the parties, that fact would give respondent no right to deprive the woman of her personal liberty, and if so restrained she could have recourse to the writ of *habeas corpus*, for relief. *Wales v. Whitney*, 114 U. S. 564, 571.

It is settled law that a husband cannot detain his wife against her will. In a very recent case decided in 1891, entitled *Reg v. Jackson*, 1 Q. B. 671, where a wife refused to live with her husband, it was held that he had no right to compel her to do so by imprisonment or confinement and she may be released from such confinement or imprisonment by *habeas corpus*. See also *People ex rel Barry v. Mercein*, 8 Page 54.

The court is convinced of the truthfulness of the woman's testimony that the respondent bought her in China and that she has been forced to live the life of a prostitute ever since she has been in Hawaii. Her statement as to the character of life she has been living is borne out by the testimony of the woman, Ah Yee, who for three months prior to July, 1903, acted as a nurse for the two children. She says that she saw many men coming to the room of Jung Hung and passing the night there during that time; that Jung Hung slept in the same room with the men that came there, while the reputed husband, Jue Gun was walking about outside her door.

Lee Chee Hing, the petitioner, testified that Jung Hung carried on the business of a prostitute and that he had gone there many times during the past four years to pass the night with her; that he went there first at the solicitation of Jue Gun. He also testified that Jue Gun stated that he would stab the woman to death if she attempted to go and live altogether with petitioner. It is in evidence that petitioner wished to marry the woman and take her away from this life.

Jung Hung testified that she was compelled to prostitute herself for money and give the money to Jue Gun; that she was in fear of her life; that she was afraid to leave the house as he had made threats to kill her if she did so. The testimony

of the United States Marshal is significant as showing the condition of matters. The woman according to his testimony while exhibiting fear and depression when he removed her from the home of the respondent, yet her whole demeanor changed and she looked pleased and happy when finally placed in the jail.

It is true the testimony does not disclose any actual physical restraint upon the part of the respondent to prevent the woman from leaving the house where she was restrained. However, it matters not in what manner or by what means a person is restrained of his liberty. It may be by threats as well as by forcible action if the power exist to enforce the threats. A person need not be put under lock and key to be deprived of liberty.

As has been said by a learned judge, "liberty as protected by the Constitution is not cramped into a mere freedom from physical restraint of the person." *People v. Marx*, 99 N. Y. 377, 386.

"Words are sufficient to constitute an imprisonment if they impose a restraint upon the person and the plaintiff is accordingly restrained, for he is not obliged to incur the risk of personal violence and insult by resisting until actual violence is used." *Pike v. Hanson*, 9 N. H. 493; *Hurd on Habeas Corpus*, 210.

The evidence shows that the respondent has done no business for over four years; that the house where he lived with the woman Jung Hung was a sort of an opium den where his friends came to smoke that narcotic. He testified that it cost him over forty dollars a month to live, but unlike the majority of his race who are industrious, he has no known means of livelihood; the woman testified that she earned from eight to ten dollars a day as the results of her shameful vocation and that she gave the money to respondent. One does not need to seek far for a motive for keeping this woman in the fear and restraint of personal liberty in which she was held. She was a valuable asset to the petitioner.

Every person under the Constitution and laws of the United States is entitled to the enjoyment of personal liberty; of the

right of free locomotion to go when and where one pleases, and to do all that is necessary in the conduct of one's affairs restrained only so far as one infringes upon the rights or the welfare of others. *Snyder v. Walford et al.*, 11 Mo. 513; *Pinkerton v. Verberg*, 78 Mich., 573; *City of St. Louis v. Roche*, 126 Mo. 541; *State v. Austin*, 114 N. C. 855.

And again; it is not possible for any Asiatic to introduce into this territory undisturbed, any of the customs or laws of China which are in violation of the Constitution. A condition of slavery of the lowest type has been shown to exist in this case; and no form of slavery or involuntary servitude except as a punishment for crime and upon due conviction thereof can under the thirteenth article of the amendments to the Constitution of the United States, be permitted to exist in this territory. *U. S. v. Wong Kim Ark*, 169, U. S. 649, 677.

The writ is allowed, the woman Jung Hung released and the respondent is ordered to pay the cost of this proceeding. Any attempt hereafter made upon the part of respondent to exercise any power or control over this woman will be treated as a serious contempt of court, and will be punished accordingly.